## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| WISE ALLOYS, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   Civil Action No.  CV-04-S-3465-NW |
| | ) |
| INTERNATIONAL | ) |
| BROTHERHOOD OF | ) |
| ELECTRICAL WORKERS, | ) |
| LOCAL 558, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

This action is brought by plaintiff, Wise Alloys, LLC ("the company" or "Wise Alloys"), against the International Brotherhood of Electrical Workers, Local 558 ("the union" or "IBEW 558"), seeking to vacate a labor arbitration award issued under the terms of a collective bargaining agreement.  This court has jurisdiction pursuant to 28 U.S.C. § 1331, as this case is brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  The action now is before the court on the parties' cross-motions for summary judgment.[1]

### PART ONE

*Factual Background*

---

[1] Doc. no. 10 (Wise Alloys' motion for summary judgment); doc. no. 13 (IBEW 558's cross-motion for summary judgment).

Wise Metals Group, LLC organized Wise Alloys in 1999 to acquire and operate an aluminum rolling mill located in Muscle Shoals, Alabama.[2]  The Muscle Shoals facility produced coiled aluminum sheets for use by beverage can manufacturers, truck trailer manufacturers, and other similar end-use manufacturers.[3]  Wise Metals Group also established the Listerhill Total Maintenance Center ("Maintenance Center") in October 2003, and located the business within a quarter-mile of the sheet finish area of the Wise Alloys facility.[4]  The Maintenance Center was created to provide mechanical maintenance and repairs to manufacturing companies, and one of its customers was Wise Alloys.[5]  It is undisputed that Wise Alloys and the Maintenance Center were separate legal entities, notwithstanding the common ties to Wise Metals Group, and the close proximity of the companies' facilities.[6]

**A.**   *The Collective Bargaining Agreement*

After acquiring the Muscle Shoals facility in 1999, Wise Alloys hired a

---

[2] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript of arbitration hearing, at 17; doc. no. 10 (Wise Alloys' memorandum), at 2 (first statement of undisputed material fact).  The record does not specify the name of Wise Alloys' parent company.  The court notes, however, that it is Wise Metals Group.  *See* description of Wise Metals Group, *available at* http://www.wisemetals.com.

[3] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 9 and 17; *see also* doc. no. 10 (Wise Alloys' memorandum), at 3 (second statement of undisputed material fact).

[4] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 14, 65-66, 119.

[5] *See id.* at 21-22.

[6] *See id.* at 22.

majority of the mill's existing workforce, which included electricians, mechanics, steelworkers, laborers, and others.[7] Wise Alloys also recognized the existing unions, and entered into a labor agreement with the unions in 1999, and in 2002.[8] Among the signatories to the 2002 agreement was IBEW 558, the electricians' union and the defendant in this case.[9] The parties agree that this agreement was in force during the time period relevant to this suit.

The 2002 agreement set forth twenty-six Articles governing the employer-employee relationship between Wise Alloys and its union employees.  In pertinent part, Article XXIV placed certain limitations on the company's ability to contract work to outside businesses, as follows:

> The Company will, before contracting out any major item of normal maintenance work, notify the Union and discuss with them the reason for such action.
>
> Section 1.  New construction projects will be contracted out as in the past. Modification to existing plant mills, machinery, equipment, where complete new systems are installed to replace old systems, may be contracted out if plant employees are unable to perform after discussion with Unions involved prior to contracting out.  *The company confirms that as to its future and to its employees that it will endeavor to properly staff so as to perform all routine maintenance with its employees. Notification of all intent to contract out will continue to be sent to the*

---

[7] *See id.* at 18.

[8] *See id.*

[9] *See id.*

*applicable Unions.*[10]

Article XVII, in turn, gave teeth to these and other restrictions enumerated in the collective bargaining agreement, by setting forth a grievance mechanism to be utilized by IBEW 558 and other unions. Article XVII was not without its own restrictions and limitations, however. In the event of a violation of the terms of the collective bargaining agreement, Article XVII required the union to lodge a grievance in a timely manner:

> Any grievance or complaint concerning violation of or non-compliance with this Agreement . . . must be presented within five (5) working days *after occurrence of the matter out of which the grievance arose*, in order to be considered under this Agreement.[11]

Once a grievance was lodged, the company and the union were to attempt to resolve their differences, but if those discussions failed, Article XVII provided for arbitration of the parties' dispute.[12] Article XVII expressly provided that "[t]he decision of the arbitrator shall be final and binding upon all parties concerned."[13]

**B.**   *Dolley 187*

The steelworkers at the Wise Alloys facility used "dollies" (large heavy forklifts) to lift and transport heavy coils of aluminum from one part of the mill to

---

[10] Doc. no. 1 (complaint), attached labor agreement, at 33 (emphasis supplied).

[11] *Id.* at 28 (emphasis supplied).

[12] *See id.* at 29.

[13] *Id.*

another.  Each dolley was equipped with three types of motors:  a "steering motor," which allowed the forklift operator to steer the equipment left or right; a "hoist motor," which allowed the operator to elevate and lower the forklifts; and importantly, a "travel motor," which allowed the operator to move the dolley forward and backwards.[14]  The motors were electrically powered by large batteries located on the dolley.[15]

It is undisputed that the electricians at Wise Alloys recharged these batteries after every shift.[16]  Electricians also could be required to work together with Wise Alloys' mechanics, in the event a damaged motor needed to be replaced.  For example, in the case of a travel motor, each motor weighed 200 to 300 pounds, and the motor was connected to an electrical control system located on the dolley, by way of wires.[17]  To replace a damaged travel motor:  (*i*) an electrician would first check the electrical components of the damaged motor and disconnect its wiring; (*ii*) a mechanic would unloosen the motor's base bolts, disconnect the drive shaft, and remove the damaged motor; (*iii*) the mechanic would install a new or repaired motor; and (*iv*) the electrician would reconnect the motor wiring, and check the dolley's

---

[14] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 54-55.

[15] *See id.* at 10, 26-27.  Wise Alloys also used dollies that ran on diesel fuel.  *See id.* at 10.

[16] *See id.* at 122.

[17] *See id.* at 32, 55-56.

electrical controls to ensure they were not damaged.[18]  With regard to the preceding steps, an electrician expended approximately 45 minutes to check and disconnect the wiring, and expended an additional 45 minutes to reconnect the wiring and check the electrical controls, for a total of 1.5 hours.[19]

A dolley identified as number 187 ("Dolley 187") broke down on October 21, 2003.  It was determined that a travel motor had burned out, requiring the motor to be replaced.[20]  There was some confusion, however, as to who would actually perform the repairs.  Ralph Morgan was an electrical foreman and a member of IBEW 558. Morgan was initially under the impression that his electricians would work together with the mechanics to replace the motor, but he was unable to get any mechanics to assist.[21]  Morgan communicated this information to Don Burbank, an IBEW 558 union steward, and Burbank in turn relayed the information to Buddy Whitten, a Wise Alloys "maintenance supervisor."[22]  During the latter conversation, Burbank specifically asked Whitten to assign mechanics to assist the electricians with Dolley 187.  Whitten purportedly responded that "he didn't have the people or the manpower

---

[18] *See, e.g., id.* at 32-35, 51-57.

[19] *See id.* at 34-35.

[20] *See, e.g., id.* at 12.

[21] *See id.* at 29.

[22] *See id.* at 29-31.

to do that,"[23] and stated that the repair work consequently would have to be awarded to an outside contractor.[24]  Burbank objected on the grounds that the work should be retained in-house.[25]  Regardless, it is undisputed that Dolley 187 was transported to the Listerhill Total Maintenance Center (Wise Alloy's sister company) the same day, October 21.[26]

On or about the next day, October 22, steward Burbank notified supervisor Whitten that he "would have to file a grievance."[27]

The Maintenance Center subsequently "completed" the repairs on Dolley 187 on October 31, 2003, over a week after the dolley had been transported.[28]  All told, the job took only a total of four hours, although the record does not specify whether those hours were all expended on the same day.[29]  Burbank, in his capacity as an IBEW 558 steward, proceeded to lodge a written grievance on November 5, 2003[30]

---

[23] *Id.* at 31.

[24] *See id.*

[25] *See id.* at 42.

[26] *See* doc. no. 10 (Wise Alloys' memorandum), at 7 (fourteenth statement of undisputed fact); doc. no. 14 (IBEW 558's memorandum in response), at 3 (no dispute that Dolley 187 was transported to the Mechanical Center on October 21, 2003).  *See also* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 111 (repair work "requested" on October 21, 2003); *id.*, Ex. D, copy of work form maintained by the Maintenance Center.

[27] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 44 (Burbank recalled that he made this statement on October 22, 2003, the day after Dolley 187 was transported to the Maintenance Center, but he was "not sure on that").

[28] *See id.* at 112-13; *id.*, Ex. D (Maintenance Center work form).

[29] *Id.*

[30] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. E, copy of written grievance.

— *i.e.*, five days after the repairs on Dolley 187 were "completed."  The union complained that the IBEW 558 electricians were denied the opportunity to perform the electrical work on Dolley 187.[31]

The union's complaint was denied throughout the grievance process, with the company maintaining that it had the prerogative to contract mobile equipment repair to outside vendors as the need arose.[32]  Having exhausted these discussions, IBEW 558 and Wise Alloys submitted their dispute to arbitration.  Arbitrator Marsha Murphy was assigned to the case, and a hearing was conducted on September 15, 2004, at which time she had the opportunity to receive and evaluate the evidence summarized above.  Arbitrator Murphy issued her decision on December 5, 2004.[33]

**C.**     *Arbitrator Murphy's Decision*

The threshold question before Arbitrator Murphy was whether the union had lodged its grievance in a timely manner.  The parties agreed that if the grievance were deemed to be untimely, the dispute could not be arbitrated under the terms of the collective bargaining agreement.   As to that issue, the parties agreed that the following language from Article XVII governed:   "Any grievance or complaint concerning violation of or non-compliance with this Agreement . . . must be presented

---

[31] *See id.*

[32] *See id.*, Wise Alloys' responses to grievance.

[33] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision.

within five (5) working days *after occurrence of the matter out of which the grievance arose*, in order to be considered under this Agreement."[34]

Wise Alloys argued that the relevant "occurrence" took place on October 21, 2003, when Whitten advised Burbank that the repair work on Dolley 187 would be contracted to an outside business.  Under that interpretation, the union's grievance would be untimely, because it was not presented until November 5, eleven days after October 21.[35]

The union argued in response that the relevant "occurrence" took place on October 31, 2003, when the repairs for Dolley 187 were actually completed by the Listerhill Total Maintenance Center.  Under the union's interpretation, the November 5 grievance was filed within five days of October 31 and, therefore, timely.[36]

Arbitrator Murphy ultimately agreed with the union's position, reasoning as follows:

> This arbitrator believes that when enforcing grievance procedure time limits the "occurrence" is when the act complained of actually occurs not when the Company announces its intent to do a given act.  Many other arbitrators agree with this position.  *UPPCO Inc.*, 93 LA 489, 494-95 (Goldstein, 1989); *Rolling Acres Care Center*, 91 LA 795, 797 (Dworkin, 1988); *City of Duluth*, 91 LA 238 (Gallagher, 1988); *Dayton Tree & Rubber Co.*, 46 LA 1021, 1027 (Dworkin, 1966); *Butler*

---

[34] Doc. no. 1 (complaint), attached labor agreement, at 28 (emphasis supplied).

[35] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision, at 3.

[36] *See id.* at 3-4.

9

*Manufacturing Co.*, 52 LA 633, 635-36 (Larkin, 1969).  If a Union were required to file a grievance every time the Employer announced a possible course of action instead of when the act actually occurred, many more grievances would be filed.  When the parties have time to discuss and deliberate one another's respective positions, the Company has the opportunity to decide whether to perform the intended act, and the Union has the opportunity to decide whether that act is really a contract violation.  In this case Supervisor Whitten and Union Steward Burbank disagreed on October 21, 2003 about the subcontracting of dolley work.  It was not until the work was actually *performed* by a subcontractor that the Union was made aware that Company's intent had actually been accomplished.  In this case the actual work on the dolley was *performed* on October 31, 2003 and the Union filed the grievance within five days of this occurrence.  The grievance was timely.[37]

Having resolved this preliminary issue, Arbitrator Murphy next addressed the question of whether Wise Alloys had violated Article XXIV of the collective bargaining agreement.  Arbitrator Murphy ultimately answered in the affirmative, on two independent grounds.

Arbitrator Murphy first focused on the following provision in Article XXIV: "The Company confirms that as to its future and to its employees that it will endeavor to properly staff so as to perform all routine maintenance with its employees."[38]  With regard to this language, Arbitrator Murphy determined that the repair work on Dolley 187 constituted "routine maintenance" and, accordingly, Wise Alloys was required to retain the work in-house.  As she explained,

---

[37] *Id.* at 4 (emphasis supplied).

[38] Doc. no. 1 (complaint), attached labor agreement, at 33.

The Union maintained that the subcontracting of electrical work on Dolley #187 was the subcontracting of routine maintenance work. I agree. The testimony at the hearing demonstrated that this work was usually done by in-house electricians. In this case, there were no unusual circumstances involved; this was not a "special job" or an emergency . . . . There was a sufficient number of electricians present on October 21, 2003 to disconnect and later connect the electrical wires of Dolley #187's travel motor. Without a showing of unusual circumstances preventing the Company from being able to get the work done even though it endeavored to properly staff, this work should not have been subcontracted. It should have been preserved for IBEW electricians.[39]

In the alternative, Arbitrator Murphy determined that Wise Alloys had violated the following provision in Article XXIV: "Notification of *all* intent to contract out will continue to be *sent* to the applicable Unions."[40] Arbitrator Murphy observed that on October 21, 2003, supervisor Whitten *orally* notified steward Burbank that the repair work on Dolley 187 would be contracted out. Even so, Arbitrator Murphy found that this was not enough, saying

this conversation did not constitute the notice required by Article XXIV. Article XXIV requires that the notice be "sent" to the Union. When negotiating this clause the parties obviously contemplated a more formal type of notification. Union witnesses testified [at the arbitration hearing] that the Company usually sent a form to the Business Manager of the Union stating the type of work that was to be subcontracted and that this action prompted discussions between the certified bargaining representative and Company officials.[41] Indeed, an example of this

---

[39] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision, at 8-9 (footnotes omitted).

[40] Doc. no. 1 (complaint), attached labor agreement, at 33 (emphasis supplied).

[41] *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. B, Transcript, at 75 (testimony

form was introduced into evidence at the hearing.  See Union Ex. 5.[42] Had there been such a discussion, the parties may have been able to compromise and avoid the filing of this grievance.  This was not an emergency situation.  The dolley broke down on October 21, 2003 and set [sic] on Company property until October 30, [sic] 2003 when it was repaired.  Discussions could have taken place.[43]

Arbitrator Murphy went on to hold, however, that while there was a violation of XXIV, the union was not entitled to monetary relief.  Arbitrator Murphy reasoned that the union had failed to demonstrate that any electrician actually lost the number of hours of work (1.5 hours) alleged.[44]

Dissatisfied with these results, Wise Alloys commenced this lawsuit on December 17, 2004, seeking to vacate the decision rendered by Arbitrator Murphy.  Wise Alloys moved for summary judgment on March 7, 2005.  IBEW 558 filed its cross-motion for summary judgment on April 6, 2005.

## PART TWO

### Discussion

The parties agree that this case is properly brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, as it involves an assertion of

---

of Charles Lamon, Assistant Business Manager of IBEW 558) ("There's usually and generally a form that is filled out and historically has been given to the shop steward first to try to have a discussion out on the floor between the parties out there, and then it comes to the — the copy is sent to the Union Hall.").

[42] This form is located at doc. no. 14 (IBEW 558's evidentiary submission), Ex. E.

[43] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision, at 9.

[44] See id. at 10.

rights under an agreement between an employer and a labor organization. *See, e.g., Major League Baseball Players Association v. Garvey*, 532 U.S. 504, 509 (2001). It is well-settled that judicial review of an arbitration decision made pursuant to a collective-bargaining agreement is "very limited." *Id.* at 509. *See also, e.g., IMC-Agrico Company v. International Chemical Workers Council of the United Food and Commercial Workers Union, AFL-CIO,* 171 F.3d 1322, 1325 (11th Cir. 1999) ("A federal court's review of an arbitration award is extremely narrow.") (internal markings and citation omitted).  In pertinent part, a district court is not authorized to review the arbitrator's decision on the merits, despite a party's contention that the decision rested on erroneous findings of fact, or a party's contention that the arbitrator misinterpreted the terms of the parties' collective-bargaining agreement. *See Garvey*, 532 U.S. at 509 ("Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement."); *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.  The same is true of the arbitrator's interpretation of the contract."); *see also id.* at 39 ("improvident, even silly factfinding" by arbitrator does not make her decision

unenforceable); *United Steelworkers of America v. Enterprise Wheel & Car Corporation*, 363 U.S. 593, 596 (1960) ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.").

Stated differently, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of [her] authority, the fact that a court is convinced [she] committed serious error does not suffice to overturn [her] decision." *Garvey*, 532 U.S. at 509 (internal markings and citation omitted).[45]

The deference due to an arbitrator's decision, however, is not without limitation. Importantly, an arbitrator may not stray from her duty to interpret and apply the terms of the collective-bargaining agreement. As the Supreme Court stated nearly a half-century ago in *Enterprise Wheel*,

> an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from

---

[45] This deference to the arbitrator's decision flows from the fact that the parties have contracted to have their dispute settled by an arbitrator, rather than a judge. Thus, it is the arbitrator's views of the facts, and the arbitrator's view of the meaning of the terms of the collective bargaining agreement, that the parties have agreed to accept. *See Misco*, 484 U.S. at 37-38. Courts also are mindful that the speedy resolution of labor disputes would be greatly hindered if the courts, and not arbitrators, were to have the final say on the merits of arbitration awards. *See id.* at 38; *Enterprise Wheel*, 363 U.S. at 596. *Cf. also B.L. Harbert International, LLC v. Hercules Steel Company*, ___ F.3d ___ , 2006 WL 462368 (11th Cir. Feb. 28, 2006) (review of commercial arbitration award under the Federal Arbitration Act) (absent an "objectively reasonable belief that it will prevail," a party that loses in arbitration is strongly discouraged from litigating the dispute in federal court).

> many sources, yet his award is legitimate only so long as it draws its
> essence from the collective bargaining agreement.  When the arbitrator's
> words manifest an infidelity to this obligation, courts have no choice but
> to refuse enforcement of the award.

363 U.S. at 597.  *See also, e.g., Garvey*, 532 U.S. at 509 (quoting the standard set

forth in *Enterprise Wheel*); *Misco*, 484 U.S. at 36 (same).  The Eleventh Circuit has

added a gloss to *Enterprise Wheel*, instructing that an arbitrator's decision fails "to

draw its essence" from the collective bargaining agreement when the arbitrator

renders an award "that contradicts the express language of the agreement."  *IMC*

*Agrico*, 171 F.3d at 1325 (citing *Bruno's, Inc. v. United Food and Commercial*

*Workers International Union, Local 1657*, 858 F.2d 1529, 1531 (11th Cir. 1988)).

An arbitrator's decision "may not ignore the plain language of the contract."  *Misco*,

484 U.S. at 38.[46]  *See also, e.g., Detroit Coil Company v. International Association*

*of Machinists & Aerospace Workers, Lodge #82*, 594 F.2d 575, 579 (6th Cir. 1979)

("The arbitrator is confined to the interpretation and application of the collective

---

[46] This quote from *Misco* must be read in context.  The Supreme Court instructed:

> To resolve disputes about the application of a collective-bargaining agreement, an
> arbitrator must find facts and a court may not reject those findings simply because it
> disagrees with them.  The same is true of the arbitrator's interpretation of the
> contract.  The arbitrator may not ignore the plain language of the contract; but the
> parties having authorized the arbitrator to give meaning to the language of the
> agreement, a court should not reject an award on the ground that the arbitrator
> misread the contract.

*Misco*, 484 U.S. at 38.

bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions.")

A labor arbitration decision also may be subject to substantive review if the decision is "irrational." *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1276 (11th Cir. 1982) (citations omitted). *See also, e.g., IMC-Agrico*, 171 F.3d at 1325. The Third Circuit has added that an arbitrator's decision may be vacated "if it is entirely unsupported by the record." *Citgo Asphalt Refining Company v. The Paper, Allied-Industrial, Chemical, and Energy Workers International Union Local No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004) (internal markings and citations omitted).[47]

**A.**     *Timeliness of the Grievance — Article XVII*

Article XVII of the collective bargaining agreement expressly requires the union to present a grievance within five working days "after occurrence of the matter out of which the grievance arose."[48] Arbitrator Murphy determined that IBEW 558 had satisfied this procedural requirement and, therefore, the union's grievance was timely. Wise Alloys challenges this finding here.

---

[47] An arbitrator's decision pursuant to a collective bargaining agreement also may be deemed unenforceable on other grounds. *See, e.g., Misco*, 484 U.S. at 38 (decision may be deemed unenforceable if it is "procured by the parties through fraud or through the arbitrator's dishonesty"); *Delta Air Lines, Inc. v. Air Lines Pilots Association*, 861 F.2d 665, 670 (11th Cir. 1988) (under the rarest circumstances, public policy considerations may require that an arbitration decision be deemed unenforceable). Wise Alloys does not raise these arguments here.

[48] Doc. no. 1 (complaint), attached labor agreement, at 28 (emphasis supplied).

At the heart of the dispute is the meaning of the word "occurrence," in the context of the phrase "after occurrence of the matter out of which the grievance arose." Wise Alloys now argues that the relevant "occurrence" took place on October 21, 2003, when a company supervisor (Buddy Whitten) *advised* the union steward (Don Burbank) of his (Whitten's) *intent* to contract out the repair work on Dolley 187, and when the equipment was in fact *transported* to the Listerhill Total Maintenance Center to await repairs.[49] Arbitrator Murphy disagreed, finding that the "occurrence" took place ten days later, on October 31, 2001, when the Maintenance Center actually *performed* the repair work on Dolley 187.

As a threshold matter, the court finds that the word "occurrence," in the context of the phrase "after occurrence of the matter out of which the grievance arose," is susceptible to different meanings in the context of the facts presented. Arbitrator Murphy was therefore required to apply the contract language to the evidence before her. Wise Alloys nevertheless attempts to undermine Arbitrator Murphy's decision on three grounds. Wise Alloys first complains that Arbitrator Murphy's opinion failed to "draw its essence" from the collective bargaining agreement, because it "rewrote" the language of Article XVII, so that grievances may now be lodged within five working days after the contracted-out work is performed.[50] The court agrees that

---

[49] *See* doc. no. 10 (Wise Alloys' memorandum), at 14.

[50] *See id.* at 13.  Wise Alloys actually asserts as follows:  "Under Arbitrator Murphy's

the plain language of Article XVII says nothing about "performance."  However, Arbitrator Murphy did not rewrite Article XVII as Wise Alloys contends; rather, she applied the contract language to the facts presented.  While Arbitrator Murphy *arguably misapplied* the pertinent language,[51] that is not the test.  Wise Alloys and the union bargained for Arbitrator Murphy's interpretation and application of the contract terms, and Wise Alloys cannot now complain, merely because it received an unfavorable decision at arbitration.

Wise Alloys also challenges Arbitrator Murphy's decision on the grounds that

---

holding, the Labor Agreement now provides that grievances may be presented 'within five (5) working days after the contracted-out work is *complete*,' or 'within 11 working days of *first knowledge of a breach*.'" *Id.* (emphasis supplied).  The court finds that this statement takes some liberties with Arbitrator Murphy's opinion.  Arbitrator Murphy said nothing about "first knowledge of a breach."  She also did not state that the union may file a grievance within five working days after the contracted-out work is "complete."  The word she used was "performed."

[51] Buddy Whitten (Wise Alloys' supervisor) advised Don Burbank (the union steward) on October 21, 2003 that the repair work on Dolley 187 would be contracted out, and the equipment was in fact transported to the Listerhill Maintenance Center the same day.  On or about the next day, October 22, Burbank asserted that a grievance would be filed.  Wise Alloys stakes its interpretation of "occurrence" on the basis of these facts, and certainly, the company's argument is not without some merit.

There also is evidence in the record, however, supporting Arbitrator Murphy's position.  The union presented its grievance on November 5, 2003.  *See* doc. no. 10 (Wise Alloys' evidentiary submission), Ex. E.  The grievance form required the union to "describe" its complaint, to which Burbank asserted the following:

> Dolley 187 was sent to LTMC for (drive motor change out)[.]  After change out was completed, *the dolley was to be sent back to the Elect. tech. Dolley Shop for motor hook up and check out, this was NOT done, motor was hooked up by diesel mech.*

*Id.* (emphasis supplied).  The gravamen of this complaint is that the motor repairs were actually performed without the assistance of the IBEW 558 electricians.  The fact that Dolley 187 was "sent" to the Listerhill Total Maintenance Center, while mentioned, was not emphasized.

it is irrational.  Wise Alloys argues that under Arbitrator's Murphy's interpretation of Article XVII,

> even if the contracted-out work takes months to complete, the Union may sit back and wait until five days after the maintenance work is finally completed — though it was long ago made known to and not concealed from the Union that the maintenance work would be performed by a contractor — and then  file their grievance, presumably seeking compensation for its represented employees for the entire period of time.[52]

Here, Wise Alloys' understanding of Arbitrator Murphy's decision is only partially correct.  It is true that pursuant to Arbitrator Murphy's decision, the union may wait until five days after the contracted-work is performed before presenting a grievance.  As Wise Alloys suggests, this waiting period may conceivably stretch from days to weeks, even months.[53]  Wise Alloys misunderstands Arbitrator Murphy's decision, however, when it suggests that the union may subsequently seek compensation for "the entire period of time" — *i.e.*, from the moment that equipment is transported to an outside business for repairs, to the time when repairs are actually performed.  In this case, Arbitrator Murphy found that Dolley 187 was transported to the Listerhill Total Maintenance Center on October 21, 2003, and repairs were not performed until October 31, 2003.  The union did not pursue damages on the basis of this entire ten-

---

[52] Doc. no. 15 (Reply in Support of Motion for Summary Judgment), at 5.

[53] Wise Alloys does not appear to argue that this result, standing alone, renders Arbitrator Murphy's decision to be "irrational."

day period.  Instead, the union merely sought compensation for the *1.5 hours* that its

electricians would have expended, had the repair work been retained in-house.

Indeed, Arbitrator Murphy rejected even that modest request, on the basis that the

union had failed to demonstrate that any electricians actually lost 1.5 hours of work

due to the company's actions.  The court finds nothing "irrational" about this

decision; instead, it is imminently rational.

Finally, Wise Alloys argues that one of Arbitrator Murphy's factual findings

is without evidentiary support, thus requiring this court to vacate her decision.  On

page 4 of her decision, Arbitrator Murphy said:

> In this case Supervisor Whitten and Union Steward Burbank disagreed
> on October 21, 2003 about the subcontracting of dolley work.  *It was not
> until the work was actually performed by a subcontractor that the Union
> was made aware that Company's intent had actually been
> accomplished*.  In this case the actual work on the dolley was performed
> on October 31, 2003 and the Union filed the grievance within five days
> of this occurrence.  The grievance was timely.[54]

Wise Alloys takes issue with the portion of Arbitrator Murphy's decision italicized

above, characterizing it as follows:

> Arbitrator Murphy asserted, without support anywhere in the record, that
> the Union was not aware that the work on Dolley No. 187 had been
> contracted out until October 31, 2003, when the Dolley was returned.
> Award at 4.  But there is no evidence whatsoever in the record to

---

[54] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision, at 4 (emphasis supplied).

support this determination, and therefore, it must be rejected.[55]

The court finds that Wise Alloys again misconstrues Arbitrator Murphy's decision. Arbitrator Murphy determined that the repair work on Dolley 187 was performed (*i.e.*, the act constituting the "occurrence of the matter out of which the grievance arose") on October 31, 2003, and the union was made aware of that fact. These factual findings were supported by the record. The records maintained by the Listerhill Total Maintenance Center showed that the repairs on Dolley 187 were "completed" on October 31, 2003. The union's grievance shows that by November 5, 2003, the electricians were aware that the repairs had been performed on Dolley 187 without their assistance.[56]

In sum, the court finds that Arbitrator Murphy did not stray from her duty to interpret and apply the terms set forth in Article XVII of the collective bargaining agreement. Arbitrator Murphy's decision did not fail to draw its essence from the contract language, it was not irrational, and her findings of fact were supported by the record.

**B.**   *Limitations on Wise Alloys' Ability to Contract Out — Article XXIV*

In the alternative, Wise Alloys argues that Arbitrator Murphy exceeded her

---

[55] Doc. no. 10 (Wise Alloys' memorandum), at 15.

[56] *See supra* note 51.

authority in determining that the company violated Article XXIV of the collective bargaining agreement.   Article XXIV places certain limitations on Wise Alloys' ability to contract out work.   Arbitrator Murphy decided on two alternate grounds that Article XXIV had been violated:   (1) the motor repairs on Dolley 187 constituted "routine maintenance" and, therefore, the work should have been retained in-house; and (2) Wise Alloys' management failed to provide adequate notice to the union of its intent to contract out the repairs.   The court finds that Wise Alloys must successfully challenge both aspects of Arbitrator Murphy's decision to prevail in this case.[57]

Wise Alloys mounts a spirited attack on the first part of Arbitrator Murphy's opinion, arguing that the motor repairs on Dolley 187 did not constitute "routine maintenance," and that the arbitrator's findings to the contrary was unsupported by the record and poorly reasoned.[58]   The court will assume, for the sake of discussion, that Wise Alloys's arguments on these issues are meritorious.   The court need not belabor the point, however, for this case may be quickly resolved upon examination of the arbitrator's second basis for ruling against Wise Alloys.

---

[57] Wise Alloys seeks a judgment declaring that the company "acted within its right under the Labor Agreement in subcontracting the motor replacement on Dolley No. 187."   Doc. no. 1 (complaint), at prayer for relief.   The company does not seek a partial victory.

[58] See doc. no. 10 (Wise Alloys' memorandum), at 20-22; doc. no. 15 (Wise Alloys' reply brief), at 8-10.

Article XXIV expressly provides that "[n]otification of *all* intent to contract out will continue to be *sent* to the applicable Unions."[59]   Arbitrator Murphy interpreted the word "sent" to mean that *oral notification* would not suffice.  A "more formal type of notification" was required, such as completion of the written notification form submitted into evidence by union witnesses.[60]  Applying this meaning of "sent" to the evidence before her, Arbitrator Murphy determined that Article XXIV was violated. Wise Alloys' supervisor (Buddy Whitten) gave the union steward (Don Burbank) oral notice of his (Whitten's) intent to contract out the repair work on Dolley 187, but a more formal form of notice was not given.

Wise Alloys challenges this aspect of the arbitrator's decision on the following basis:  Article XXIV does not expressly call for written notice to be given; and, if the parties had intended to require such notice, Article XXIV would have expressly stated that the notice be "in writing."[61]  While that argument has some appeal *on the merits*, this court is not authorized to review the arbitrator's decision in that manner. The court finds that Arbitrator Murphy, in construing the word "sent" in Article XXIV, did not stray from her duty to interpret and apply the meaning of the collective bargaining agreement.

---

[59] Doc. no. 1 (complaint), attached copy of labor agreement, at 33.

[60] Doc. no. 10 (Wise Alloys' evidentiary submission), Ex. A, arbitration decision, at 9.

[61] *See* doc. no. 10 (Wise Alloys' memorandum), at 23.

PART THREE

*Conclusion*

In light of the foregoing, the court finds that the arbitrator's decision is due to be undisturbed.  Accordingly, Wise Alloys' motion for summary judgment is due to be denied, and the cross-motion for summary judgment filed by IBEW 558 granted. An appropriate order will be entered.

DONE this 30th day of March, 2006.

United States District Judge

24